# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-09-00596-CV

**Laura Annie Cathey and Paul C. Cathey, Appellants**

**v.**

**Texas Department of Family and Protective Services, Appellee**

### FROM THE DISTRICT COURT OF BELL COUNTY, 146TH JUDICIAL DISTRICT
### NO. 217,860-B, HONORABLE RICK MORRIS, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Laura Annie Cathey and Paul C. Cathey appeal the judgment terminating their parental rights to their sons, M.C. and J.C. After a bench trial, the trial court found that clear and convincing evidence supported finding that both parents knowingly placed and knowingly allowed the children to remain in conditions and surroundings that endangered the children's physical and emotional well-being. The trial court also found that clear and convincing evidence supported finding that termination of parental rights was in the children's best interest. On appeal, the parents contend that these findings are not supported by legally or factually sufficient evidence. We affirm.

The family had been the subject of investigation almost annually since 2002, including two previous instances in which the children were removed from the house. The family includes four children—the two boys who are the subject of the judgment appealed here, M.C.

and J.C., and two older girls, B.C. and C.C., who were originally part of this suit, but were dismissed as subjects several months before the bench trial. At the time of the final hearing, the boys were, respectively, eleven and six years old and the girls were ages seventeen and fifteen. The previous case was dismissed on December 7, 2006.

According to the affidavit attached to the petition, this case was prompted by a February 2008 report that M.C. had missed over twenty days of school, had failing grades, had two lice infestations, had lost weight, and had gaps between refills of his medications. He arrived late to school regularly, was quiet and withdrawn, and had serious trouble keeping focused. Laura had been alerted to some of these issues and appeared to show concern, but no change had occurred. The investigator, Shantara Harris, noted that the children had been removed from the house the previous year because of unhealthy living conditions and the poor health of the children. She visited the Cathey home the day after receiving the report and found that the conditions were hazardous and unsanitary. She reported trash, old food, clothing, and other items scattered throughout the home. She opined that it appeared the home was being used as a trash can, with refuse seemingly poured on the floor. The parents stated that the house had gotten into that condition only in the last couple of days and that they were in the process of cleaning it up. Harris noted that excessive amounts of medication were easily accessible to the children. She described the bathroom as filthy with dirty clothes and used maxipads on the floor. Floor fans throughout the home had trash and papers stuck in them because, Paul stated, the children liked to cause the fans to make a loud noise. Harris described the children as physically neglected and odorous, as if they had not bathed regularly. J.C. told her that his parents fought over money and that sometimes Paul hit Laura. M.C. responded

to her questions that he forgot what his mother told him to say. Harris also stated that C.C. was not on medication despite having been diagnosed with mental health issues. All of the children had missed extensive amounts of school and had been infested with lice. All four children were removed from the home. B.C. and C.C. went back home later that spring under a monitored return. By order signed October 1, 2008, this case was dismissed regarding the girls.

The parents were ordered to participate in therapy individually and with their family. In June 2008, the caseworker reported inconsistent attendance at therapy sessions, and in-home therapy began. Their family therapist, Terri Schroder, reported that the Catheys were low-functioning, but cooperative and participated in therapy. Schroder stated that the house was not filthy or disgusting when she visited, but was messy. She also opined that the Catheys did not recognize cluttered floors as a problem. Schroder reported that Laura let the children have their way because she did not want them to be angry with her. Schroder reported that the family seemed genuinely happy to see each other when reunited for therapy. The caseworker reported that the front door was broken and could not be opened and that the back door had two broken hinges and was hanging on by the third. She told the parents they needed to fix the door because it was dangerous to the younger children. The state of the doors was not dangerous for the girls because they were older. She reported that M.C. and J.C.'s foster placement was safe and appropriate. Paul's therapist reported in August 2008 that Paul had problems with rage and intrusive thoughts arising from killing a boy in Afghanistan who had shot a member of his party and leveled his rifle at Paul. Paul was disturbed by the memory of removing the shooter's scarf and discovering he was a boy, which made him think it was like shooting his own child.

3

In August 2008, the caseworker reported that one therapist said that the parents did best with outside pressure, although they tended to "fall apart" when they got stressed or did not have outside pressure. Unannounced visits revealed a clean home, but there were reports that the grandmother who had been cleaning the home had to stop doing so because the work was causing her health problems. Friends and family reported that the Catheys were not paying utility bills.[1] The utilities were being shut off intermittently due to failure to make timely payments. The boys' foster mother reported that J.C. had a hard time following directions and was damaging her home (e.g. by jumping off the top bunk and grabbing the ceiling fan) despite being corrected.

In October 2008, the caseworker reported more progress in some areas. The Catheys were working on a budget and had paid utility bills. They still had trouble setting boundaries for J.C. They had begun weekend visits with the boys.

In January 2009, the caseworker reported that, despite increases in their pay and budgeting help, the Catheys were having problems paying their bills. She stated that Paul was getting counseling for his anger management issues. She reported that Laura was very motivated to get her boys returned, but did not think that her children's experience was tough compared to her experience of childhood. Schroder reported that the Catheys felt their standards of cleanliness were adequate and that the Department was just hassling them. The caseworker reported that the Catheys were ignoring the importance of school attendance and did "not appear to have their children's best interest in mind." The Catheys insisted that the girls were attending school. Schroder had

---

[1] The utilities were in the grandmother's name. However, the grandmother relied on the Catheys to pay the bills.

4

spoken to the Catheys regarding alternative school placements for B.C., but they had done nothing to move B.C. The caseworker reported continued budgeting issues that she had suggested could be resolved by less eating out, but that the problems continued. She reported continued boundary-setting issues regarding J.C. The caseworker reported that, after having unsupervised home visits, J.C. began smearing feces on the walls of his foster home. She stated that J.C.'s problems were not improving and that his behavior seemed worse after weekend home visits. The boys were making and having trouble at school.

In March 2009, Schroder noted small improvements in family functioning, but was uncertain how many of the changes were internalized and how many were temporary changes in order to placate her. She said that the parents verbalized their desire to change and create a more appropriate household, but their follow-through was inconsistent.

In May 2009, the caseworker reported some regression. The Catheys were not meeting with their budgeting case manager. Paul's course of therapy was canceled because he stopped attending. Laura had not scheduled a medication evaluation for depressed mood even though they had discussed completing it by the end of March. The girls were still not attending school as they should. Although the therapist reported that the condition of the home was marginally acceptable, the caseworker reported that unannounced visits revealed an unclean home with old food on the countertops and stove and trash, papers, and clothes lying on floors and furniture. The caseworker explained to the Catheys that they could not keep the home free of bugs and rodents under such conditions. She said that the parents continued to offer excuses for the condition of the home instead of correcting the condition. The caseworker reported that the Catheys were attending

their parenting classes, giving examples of how they were implementing the lessons, and said that Laura reported that she was being firmer with the girls about school attendance. Paul completed his anger management course, and encouraged the children to express their anger so they could learn how to control it. The caseworker concluded that the Catheys were genuinely concerned about their children, but continued to give excuses for their actions and showed little change. They still had trouble setting boundaries for J.C. The caseworker also stated that the boys' foster mother reported that the boys seemed to be regressing as well. J.C. had resumed defecating in his pants daily, and M.C., despite doing very well in school, was beginning to have difficulty paying attention in class. J.C. was taking Ritalin, but was getting additional medical attention because of his lack of progress with the drug and his violent outbursts at school.

In the final hearing report dated July 28, 2009, the caseworker reported continued regression except for Laura's improved functioning on Prozac. Laura's therapist reported that Laura appeared to have increased energy, clearer thinking, better functioning, and increased initiative. The caseworker, however, had not been able to see the home since May. Twice, on unannounced home visits, she heard movement in the home, but no one came to the door. Telephone contact failed because the Catheys' telephone was out of service. The caseworker reiterated that Paul's outbursts regarding court proceedings and the Department's stance on the condition of the home made her question whether he internalized much of the training. Similarly, she was not certain how much of the parenting skills the Catheys had internalized because they continued to have issues parenting the boys. The Catheys still had not contacted their budget manager. Despite Laura's improved functioning, the caseworker had been unable to arrange a home visit in the three months

6

since the previous report. For the first time, the caseworker recommended termination of the Catheys' parental rights to M.C. and J.C.

At trial, psychologist Timothy Daiheim also recommended termination. He had treated the boys for over a year and had been the family's therapist for four or five months. He testified that the Catheys had made progress, but also tended to regress and revert to unacceptable behaviors. Laura had made the most progress. Laura and the girls had excellent participation but Paul had not attended due to work conflicts or possibly a lack of commitment. Daiheim described the parents as apathetic, and noted that apathy was unworkable when dealing with J.C. and, to a lesser extent, M.C. Both boys needed attention, and J.C.'s condition was so extreme that medications were not effective and experts could barely keep him focused. The apathy had also led to delays in Laura getting prescribed helpful medication, failure to keep the house in repair, and the children not getting medications consistently. Apathy also caused the parents not to consistently require the girls to attend school, with the result that B.C. missed 103 days and C.C. missed the equivalent of 49 full days in a school year. Daiheim testified that consistent medication was very important for J.C. so that he was not a danger to himself. Daiheim also testified that an uncluttered physical environment was important not just for the boys' general well-being, but because J.C. was likely to pick up and throw just about anything. While in foster care, for example, he had hurled a book and hit M.C., inflicting a black eye. Daiheim also testified that the cycle of removal and return was particularly damaging to children who, like M.C. and J.C., needed a stable environment. He testified that, if this were not the parents' third time having their children removed, he

7

might believe they could turn it around. With their history and tendency to regress, however, he recommended termination.

Barbara Sanford, the boys' foster mother, testified that the boys were wonderful, but had a lot of behavior issues. J.C. broke something nearly every day. He urinated in bed and defecated on the floor—stating that he was allowed to do so at home. She testified that the boys had nightmares soon after arriving at her house that rats and roaches were walking on them. They told her that the toilet was not working at home, as it was full of feces, and that feces were also on the floor. They could not put clothes in drawers because rats would defecate on them. Their father put sticky traps down for rats, but left rats in the sticky traps. They told her that everybody did what they wanted, which led to trash and uneaten food just sitting around the house. J.C. told her he liked that, but she said M.C. preferred being clean and safe. Sanford testified that the boys loved their mother and wanted to be with her. Sanford testified that M.C. was improving, but J.C. was the same.

Conservatorship worker Leslie Campbell testified that the December 2008 lice incident exemplified the parents' apathy and inability to sustain change. The girls' continued school attendance woes also spoke to those qualities, as did the unrepaired front door. She opined that the door could fall and hurt J.C. There was no kitchen garbage can, the toilet leaked, the sewer line emptied onto the ground, and medication remained out in the open, among other issues.

Campbell and Dr. Daiheim both testified that both boys were adoptable. Schroder, however, testified that M.C. would not agree to adoption and J.C. had such severe behavior problems, he would not be easily adoptable. She said that, as of April 2009 when she last saw the family, the boys were very attached to their parents and wanted to go home. She said that the

8

family's only real progress during her therapy term was getting the boys on medication to treat their ADHD condition. She said that the Catheys did not make much progress because they did not accept the Department's standards of behavior. Schroder testified that returning the boys to the home would probably lead to further involvement by the Department. Campbell recommended termination based on the parents' chronic neglect and the hope that an adoptive home could provide safety, stability, and individualized attention that the parents had consistently shown themselves unable to provide. She testified that, when she spoke with the boys about adoption, they did not express sadness but discussed what they would like to see in an adoptive home. She conceded, however, that she did not speak to them directly about termination.

Laura testified that the boys wanted to come home. She testified that she is trying to raise the children "right" and has learned from her mistakes. She said she was willing to do whatever she had to do to bring them home. She acknowledged to the trial court that, in the spring semester, B.C. missed fourteen days of school with a doctor's note, sixteen days with a note from her mother saying she was sick, and twelve days with a note that they had car trouble. Paul did not testify.

The trial court noted on the record that the termination hearing marked the eighteenth time the parents had appeared before him since July 2006. He commented that the full ashtrays in the photographs—coupled with the price of cigarettes—demonstrated to him that the parents' failure to make important changes in their home was not purely economic hardship, but a product of misplaced priorities. He determined that the boys would have to remain in Department conservatorship, so his choice was whether it was with or without termination. He concluded that

9

the Department had tried for seven years to get the family on track and that their problems were apparently unresolvable. Consequently, the trial court found by clear and convincing evidence that the parents had knowingly placed and knowingly allowed the boys to remain in conditions and surroundings that endanger their physical and emotional well-being, and that termination of parental rights was in the boys' best interest. Based on these findings, the trial court terminated the Catheys' parental rights to the boys. On appeal, the Catheys challenge the legal and factual sufficiency of the evidence to support both of these findings.

A court may order involuntary termination only if the court finds that: (1) a parent has committed a predicate act or omission harmful to the child, and (2) termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001 (West Supp. 2009). The court must ensure that these findings are supported by clear and convincing evidence—a standard of proof specifically intended, in view of the constitutional interests at stake, to reduce the risk of erroneous terminations. *Id.*; *see Santosky v. Kramer*, 455 U.S. 745, 764-65 (1982); *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980). This Court, too, must apply a heightened standard of appellate review to complaints that the evidence is legally or factually insufficient to support the findings necessary for termination. In reviewing a legal sufficiency claim, we look at all the evidence in the light most favorable to the finding to determine whether a reasonable fact-finder could form a firm belief or conviction that the matter that must be proven is true. *In re J.F.C.*, 96 S.W.3d 256, 265-66 (Tex. 2002). We assume the fact-finder resolved disputed facts in favor of its finding if a reasonable fact-finder could do so, and we disregard all contrary evidence unless a reasonable fact-finder could not. *Id.*; *see also City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). When reviewing

10

factual sufficiency, we must give due consideration to evidence that the fact-finder could reasonably have found to be clear and convincing and then determine whether, based on the entire record, disputed evidence that a reasonable fact-finder could not have credited in favor of the finding is so significant that a fact-finder could not reasonably have formed a firm belief or conviction that the allegations in the petition were true. *In re J.F.C.*, 96 S.W.3d at 266.

The evidence is legally and factually sufficient to support the finding of endangerment. The testimony about the physical condition of the home upon the children's removal was disturbing. Piles of trash, food waste, and human waste sitting in a broken toilet lend credence to the boys' reports of human waste on the floor and their reports of their living conditions. After eighteen months of Department scrutiny and involvement, the living conditions in the house had failed to improve to an acceptable level. There were no working smoke detectors and no kitchen garbage can. The toilet leaked on the inside of the house and a sewer line just emptied into the yard. Medication was left out accessible to children. Ceiling fan blades were broken by J.C. The boys got lice while at home while they were in foster care, although they were lice-free in 2009. C.C. injured J.C. during a visit, and did not consistently take her medications. There was evidence that the children did not consistently have their medication prescriptions filled or administered while in their parents' home despite their demonstrated need for it and the dangers of abruptly stopping these medications. The boys' ADHD condition required structure and discipline, and both were regularly absent from school. B.C.'s continued absences from school during the spring semester and summer school indicated that the lack of discipline and structure persisted despite parenting classes and counseling. Although Laura testified that she had learned from her mistakes and others

testified that conditions had improved, problems repeatedly cited by the Department had not been corrected. There was testimony that J.C. said Paul had hit Laura when angry, and evidence that Paul had anger-management issues. The parents' inability or unwillingness to correct issues raised by the Department predated this 18-month case. The record provides legally and factually sufficient evidence to support the finding by clear and convincing evidence that the parents knowingly placed and knowingly allowed the boys to remain in a home that presented physical and emotional dangers to the boys when they were removed that had not been adequately mitigated by the time of trial.

The evidence is also legally and factually sufficient to support the court's finding that termination was in the children's best interest. The non-exclusive list of factors that have been considered when determining a child's best interest includes: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976).

The evidence supports a finding that the *Holley* factors support termination. Although there was testimony that the boys loved their mother especially and that both—particularly M.C.—wanted to return home, there was also testimony that M.C. asked a potential adoptive parent to adopt him. The evidence was unequivocal that the boys needed a great deal of close attention.

M.C. was diagnosed with ADHD and some mild depression. He had trouble staying focused on tasks, but had made great academic strides while in foster care. J.C. was so severely ADHD that medication had not enabled him to gain control. He lived in the moment and was not making progress despite increased and more focused attention. His impulsiveness caused him to be a risk to damage property and others, including his brother. Both boys needed consistent administration of medications so that the medications would have the best chance of taking effect. Abrupt withdrawal of the medications would blunt their effect, could cause unpleasant reactions, and had a "50-50 chance" of making them ineffective when readministered. The Catheys had not shown themselves capable of consistent administration of medications for anyone, including their older daughter. Although the physical condition of the house improved, there were significant problems remaining, such as the front door not being fully hinged and the leaking toilet and open sewer pipe. There was repeatedly expressed concern about whether the Catheys could maintain the gains in cleanliness if they were not under scrutiny. Despite therapy and classes, the Catheys were not consistently setting and maintaining boundaries and discipline for the children—especially J.C. during his visits. Although Laura and the girls participated in therapy sessions regularly, the Catheys' occasionally sporadic contact with caseworkers and other support professionals left a question regarding whether any available programs would be useful. Evidence showed that Laura and Paul had problems of their own, which interfered with their ability to parent and to absorb and implement other parenting strategies. Although Laura was improving while on Prozac, the history of sporadic distribution of medications to the children made this improvement appear tenuous. There was no post-termination permanent placement set, but the boys' foster mother said she

would keep them until a permanent placement was found.  The boys were described by some witnesses as adoptable, although M.C.'s age and J.C.'s habits might reduce their chances.  Although there was evidence that the parents wanted good things for their children, there was ample evidence to support a belief that the parents could not consistently provide minimally adequate and safe surroundings and circumstances for their younger children.  We find the evidence legally and factually sufficient to support the trial court's finding that termination of the Catheys' parental rights is in the children's best interest.

Affirmed.

_____

G. Alan Waldrop, Justice

Before Justices Patterson, Waldrop and Henson

Affirmed

Filed:   August 31, 2010

14